**FILED**

**NOVEMBER 26, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**07 C 6612**

|  |  |  |
|---|---|---|
| AIR_IT, LLC, | ) | |
| An Illinois limited liability company, | ) | |
| | ) | |
| v. | ) | Case No.:  **JUDGE NORGLE** |
| | ) | **MAGISTRATE JUDGE MASON** |
| IT SYSTEMS INTERNATIONAL, LLC, | ) | |
| a Delaware limited liability company, and | ) | **CEM** |
| IUSTIN TANASE, individually. | ) | |
| | ) | |

## AIR_IT, LLC'S COMPLAINT AGAINST IT SYSTEMS INTERNATIONAL, LLC AND IUSTIN TANASE, INDIVIDUALLY

Now comes Plaintiff, AIR_IT, LLC, ("LLC") an Illinois limited liability company, by and through its attorney The Law Offices of Ioana Salajanu, and complains against Systems International ("ITSI"), a Delaware limited liability company's, and Iustin Tanase ("Tanase"), individually, and states as follows for in support of the Complaint:

### I.   NATURE OF THIS ACTION.

1.   This is an action brought by LLC against ITSI and Tanase alleging the following causes of action:

  a) Count I: preliminary injunction against ITSI and Tanase;
  b) Count II: conversion against ITSI and Tanase;
  c) Count III: breach of the Operating Agreement against ITSI;
  d) Count IV: breach of fiduciary duties against ITSI;
  e) Count V: breach of fiduciary duties against Tanase;
  f) Count VI: misappropriation of trade secret and confidential information against ITSI and Tanase.

### II.   JURISDICTION AND VENUE.

2.   This Court has subject matter jurisdiction over this litigation under 28 U.S.C.

1332(d), as the matter in controversy exceeds the sum or value of $75,000.00 and

the dispute is between citizens of different states.

3.  Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C.

1391(a) because a substantial portion of the acts or omissions giving rise to this

claim occurred in this District.

## III.  PARTIES.

4.  LLC is a corporation organized and existing under the laws of the state of

Illinois.  LLC's principal place of business is headquartered in Rolling Meadows,

Illinois.

5.  ITSI is a limited liability company in the State of Delaware which has a legal

existence as of February 26, 2004. *See* a true and accurate copy of the

authentication from the Delaware Secretary of State as Exhibit A.

6.  Tanase is the sole owner and manager of ITSI. Tanase currently resides in

Bucharest, Romania, Europe.

## IV.  FACTUAL ALLEGATIONS.

7.  American International Radio, Incorporated ("AIR") is an Illinois corporation

incorporated in October 1990.

8.  AIR is a major system integrator and distributor of radio communication

products and technology worldwide with its principal place of business located at

3601 E. Algonquin Road, Rolling Meadows, Illinois.

9.  ITSI has one member/manager named Iustin Tanase ("Tanase").

10. ITSI did not have any employees during the time period of January 5, 2004

through the present.

11. As such, ITSI operated through, and the obligations of ITSI, were performed by

Tanase.

12. ITSI claims to have engaged in and claims to engage in, the computer software development business with an undisclosed principal place of business.  ITSI and Tanase used the office of LLC in Rolling Meadows to perform any work relating to LLC.

13. LLC is an Illinois limited liability company, incorporated on February 14, 2003.

14. LLC was a member-managed company.

15. On January 5, 2004, ITSI was added as a member of LLC.

16. On January 9, 2004, AIR and ITSI executed the Operating Agreement ("OA") of LLC. *See* a true and accurate copy of the OA attached hereto as Exhibit B.

17. On January 9, 2004, ITSI was not a legally existing company in the State of Delaware, as it became a legally existing entity on February 26, 2004.

18. AIR was not aware that ITSI was not a legally existing company in the State of Delaware, as of the execution of the OA.

19. The OA outlined the governing terms and conditions of LLC as well as the obligations of AIR and of ITSI.

20. AIR and ITSI each had a designated contribution to LLC.

21. At the execution of the OA, AIR owned 500,000 Units and ITSI owned 500,000 Units.

22. AIR paid for the Units and ITSI failed to pay for any Units, as required by the OA.

23. Per the OA, AIR had to contribute the following:

    (a) marketing and sales leads;

(b) logistical support;

(c) loan LLC $200,000 in order to support the infrastructure buildup and required working capital. *See* Exhibit B, OA, Appendix C.

24. AIR timely and fully contributed the contributions required by the OA.

25. Per the OA, ITSI had to contribute the following:

> (a) B2B platform for corporate cards system in the form of know-how, software installation of the System at the chosen site, which will start to be marketed as AIR Card System;
>
> (b) technical support;
> (c) technical information and all intellectual property rights required for the ("LLC") to fulfill its purpose.

26. ITSI was to outsource the required software development to a Romanian company.

27. ITSI and AIR, the LLC agreed to outsource the software development to a Romania company.

28. AIR fully contributed the contributions per the OA.

29. ITSI failed to fully and timely perform the contributions required by the OA.

30. LLC developed the ATBS Billing System, ATBS Provisioning System, and the AIR card, via AIR and ITSI.

31. AIR and ITSI, as such, LLC, agreed that the ATBS Billing System and the ATBS Provisioning System would be marketed to Motorola TETRA systems under the private label of AIR TETRA BILLING SYSTEM AND AIR TETRA PROVISIONING SYSTEM.

32. The ATBS Billing System and the ATBS Provisioning System that would be marketed to Motorola TETRA systems under the private label of AIR TETRA

4

BILLING SYSTEM AND AIR TETRA PROVISIONING SYSTEM were assets of LLC.

33. The ATBS Billing System and the ATBS Provisioning System would be marketed to Motorola TETRA systems under the private label of AIR TETRA BILLING SYSTEM AND AIR TETRA PROVISIONING SYSTEM were marketed as such given that AIR has a long term history and had an established credibility with Motorola; whereas LLC was a newly formed entity with no prior history in the communications domain.

34. Since ITSI became a member of the LLC, ITSI failed to conform to the OA and pay its equal share of LLC's expenses.

35. Pursuant to Section 8.6 of the OA, loses are "in proportion to each Member's Relative capital interest", which is 50% for AIR and 50% for ITSI.

36. As such, 50% of the expenses incurred by LLC are ITSI's responsibility.

37. ITSI failed to pay its share of expenses to LLC.

38. As a result of ITSI"s failure to pay its share of expenses to LLC, AIR supported and covered ITSI's portion of the expenses, including, but not limited to, the payment of the rent, telephone, internet and accounting expenses.

39. During its position as a member of the LLC, ITSI, via Tanase, made decisions regarding LLC's expenditures, without the knowledge and approval of absolute majority of the Board of Directors.

41. ITSI was made aware of its failures to adhere to the OA requirements and instructed to follow the OA's terms and conditions relating to such.

42. Tanase was appointed as the Chief Executive Officer ("CEO") of LLC.

43. Tanase was appointed as CEO based upon his representations that he has substantial experience in management, control, monitoring the performance of and ensuring internal control of companies.

44. Tanase accepted the CEO position and responsibilities for LLC.

45. As part of his CEO responsibilities, Tanase was to manage the day-to-day business affairs, manage, control, monitor performance and ensure the internal control of LLC.

46. LLC paid Tanase a salary for his CEO position by LLC, relying upon AIR funds.

47. Tanase accepted and benefited from the salary that he received.

48. Tanase failed to perform his obligations and duties as the CEO of LLC by failing to manage day-to-day business affairs, manage, control, monitor performance and ensure the internal control.

49. LLC informed Tanase of his failure to perform his obligations as a CEO.

50. LLC provided Tanase with the right to cure his failure to perform his obligations as a CEO.

51. Tanase failed and or refused to remedy his failures to perform his obligations as a CEO.

52. As a result of Tanase's failure to perform his CEO duties, Dorel Nasui, President of AIR, had to assume the responsibilities which Tanase had to perform as the CEO of LLC.

53. On or about July 2006, ITSI abandoned its member position from LLC, when Tanase fled and abandoned the United States, without prior notice to LLC.

6

54. ITSI was solely managed and owned by Tanase; as such ITSI functioned and operated through Tanase.

55. Tanase's abandonment resulted in ITSI's abandonment of ITSI's member position with LLC.

56. LLC has attempted to communicate with ITSI, through Tanase, on numerous occasions.

57. ITSI failed to respond to any of LLC's communications.

58. ITSI's abandonment and failure to communicate amounted to an express will to withdraw from the LLC.

59. ITSI failed to discharge its duties to LLC when it abandoned its member role.

60. ITSI, as a member of the LLC, had a fiduciary duty to LLC to perform its obligations and responsibilities to further the interests of LLC.

61. By failing to properly transfer the responsibilities of ITSI to LLC, upon its abandonment, ITSI breached its fiduciary duty to the LLC.

62. Without the proper transfer of control, ITSI failed to transfer documents, information or knowledge in ITSI's possession of material documents relating to LLC's financial, legal, and economic status.

63. Such information was vital to the financial, legal and economic stability of LLC.

64. Upon their abandonment, ITSI and Tanase converted and purloined inter alia, LLC's personal property, including, but not limited to, marketing materials.

65. Upon their abandonment, ITSI and Tanase, converted and purloined inter alia, LLC's intellectual property rights by taking, without authorization or consent

from LLC, LLC's intellectual property materials, including but not limited to, ATBS Billing System, ATBS Provisioning System, and the AIR card.

66. ITSI and Tanase, converted and purloined the LLC's intellectual property rights in contravention of Section 16.2-3 of the OA:

> "any trademark, trade name or other trade identity developed by the Company shall be owned by the Company…All patents and copyrights developed in connection with the course of Company's business shall be assigned to Company, regardless of whether originally developed by the Company itself or any of its Members."

67. The intellectual property materials were trade secrets of LLC.

68. Despite repeated demands by LLC, ITSI and Tanase has failed and or refused to return the intellectual property materials and or trade secrets to LLC.

69. Following ITSI's abandonment, LLC attempted to communicate with ITSI and Tanase on numerous occasions.

70. The ATBS Billing System, ATBS Provisioning System, and the AIR card. contained software programs, source codes and other technical data that were developed by LLC and or for the benefit of LLC in secret and confidence.

71. Said ATBS Billing System, ATBS Provisioning System, and the AIR card. were trade secrets which were not known to others and was intended to be registered as LLC's copyright and or trademarks.

72. Said ATBS Billing System, ATBS Provisioning System, and the AIR card were LLC's trade secret which had an economic value, actual or potential, from not being known to the general public.

73. Said ATBS Billing, ATBS provisioning materials, AIR card were confidential in nature.

74. LLC has taken reasonable precautions to protect the confidentiality of its trade secrets and other confidential business information.

75. Limited personal had access to the trade secrets.

76. Said trade secrets were protected from third parties by making it difficult to acquire or duplicate the trade secrets.

77. The trade secrets were developed in a restricted and limited environment.

78. Tanase, individually and or on behalf of ITSI, relied upon his position as a CEO to acquire and usurp said trade secrets.

79. Tanase, individually and on behalf of ITSI, improperly acquired the trade secret when he abandoned his position and acquired the trade secrets without LLC's authorization and consent.

80. LLC from July 2004 and thereafter continued to function as an operating entity.

81. From July 2004, LLC attempted to communicate with LLC regarding its abandonment, the failure to discharge ITSI's obligations, the financial obligations and the return of the LLC's intellectual property rights.

82. ITSI and or Tanase refused to respond to any such communications.

83. In light of ITSI's abandonment, LLC needed to take action to remedy the situation created by ITSI's abandonment.

84. Following failed attempts to communicate with ITSI, LLC convened a Board of Director's meeting on October 5, 2006.

85. LLC sent ITSI, via Tanase, proper notice of the meeting; including numerous correspondences, emails, telephone calls and correspondence from counsel.

86. ITSI, refused receipt of said correspondence and ignored the notification of the Board of Directors meeting.

87. A Board of Directors meeting was held by LLC on October 5, 2007.

88. Neither ITSI nor Tanase were present.

89. Based on the above, LLC passed a resolution formally withdrawing ITSI from LLC.

## VI.    COUNT I: PRELIMINARY INJUNCTIVE RELIEF AGAINST ITSI AND TANASE.

1-89. LLC repeats, re-alleges and incorporates by reference paragraphs 1 through 89 of the Factual Allegations, as paragraphs 1-89 of this Count I, as though fully set forth herein.

90. Tanase, individually and or on behalf of ITSI, relied upon his position of LLC's CEO to usurp, purloin and misappropriate LLC's ATBS Billing System, ATBS Provisioning System, and the AIR card.

91. Tanase, individually and or on behalf of ITSI, had knowledge that the ATBS Billing System, ATBS Provisioning System, and the AIR card, contain software programs and source codes which are a trade secrets of LLC.

92. The OA is clear and unambiguous in that "any trademark, trade name or other trade identity developed by the Company shall be owned by the Company…All patents and copyrights developed in connection with the course of Company's business shall be assigned to Company, regardless of whether originally developed by the Company itself or any of its Members." *See* Exhibit B, OA, Section 16.2-3.

93. As such, LLC has a clear and ascertainable right to the intellectual property

materials and or trade secret in possession of Tanase, individually, and or on behalf of ITSI.

94. Upon ITSI's and Tanase's abandonment in July 2006, Tanase, individually and on behalf of LLC, converted, purloined and misappropriated, LLC's intellectual property materials in the form of software, including but not limited to, ATBS Billing System, ATBS Provisioning System, and the AIR card.

95. LLC has no adequate remedy at law which to obtain the usurped and purloined intellectual property materials, without LLC's knowledge and or authorization.

96. LLC will be irreparably harmed if LLC is not in possession of LLC's intellectual property materials and which intellectual property materials and or trade secrets are in control of or in possession of Tanase, individually and on behalf of LLC.

97. LLC believes that Tanase, individually and on behalf of LLC, usurped and purloined LLC's intellectual property materials and or trade secrets, without LLC's knowledge and or authorization, with an intent to sell and or contract with third parties for profit to Tanase or an assignee of Tanase.

98. LLC believes that Tanase, individually and or on behalf of ITSI, will in the immediate future (a)sell and or contract with third parties LLC's intellectual property materials, for profit to Tanase or an assignee of Tanase, (b)register with the appropriate trademark and or copyright or patent office LLC's intellectual property materials under a name other than LLC; and or (c) destroy the LLC's intellectual property materials.

99. As such there is a great injury of irreparable harm to LLC if the injunction is not granted.

100. Since LLC's intellectual property materials are the assets of a private company, there is no injury to the general public in granting the injunction.

Wherefore, AIR_IT, LLC, an Illinois limited liability company, respectfully requests that this Court enter Judgment in its favor and against IT Systems, International, LLC, a Delaware limited liability company as follows:

A) An Entry of a Preliminary Injunction against IT Systems, International seeking to:

(i) enjoin and restrain ITSI and Tanase and all persons in active concert or participation with them from directly or indirectly transferring, copying, disclosing, divulging or using in any form LLC's intellectual property materials and trade secrets;
(ii) Requiring ITSI and Tanase and all persons in active concert or participation with them to take all the steps necessary to recover and or retrieve and then secure any and all copies of LLC's intellectual property materials and trade secrets;
(iii) A demand for a return of LLC's intellectual property materials, including any and all

B) Any other relief as this Court may deem fit.

## VII.    COUNT II: CONVERSION AGAINST TANASE AND ITSI.

1-100. LLC repeats, re-alleges and incorporates by reference paragraphs 1 through 100 of the Factual Allegation and of Count I, as paragraphs 1-100 of this Count II, as though fully set forth herein.

101. On or about July 2006, upon his abandonment, Tanase individually and on behalf of ITSI converted and purloined inter alia, LLC's intellectual property materials and trade secrets by taking, without authorization or consent from the LLC; said intellectual property materials in the form of software, including but

12

not limited to, ATBS Billing System, ATBS Provisioning System, and the AIR card.

102. Per the OA, the LLC has an absolute and unconditional right to the immediate possession of the property.

103. LLC believes that Tanase, individually and or on behalf of ITSI, will in the immediate future (a)sell and or contract with third parties LLC's intellectual property materials, for profit to Tanase, individually and or behalf of ITSI, or an assignee of Tanase and or ITSI, (b)register with the appropriate trademark and or copyright or patent office LLC's intellectual property materials and trade secrets under a name other than LLC; and or (c) destroy LLC's intellectual property materials.

104. LLC has made repeated demands for the possession of the intellectual property materials.

105. Tanase, individually, and or on behalf of ITSI, has refused and failed to repeatedly grant possession to LLC of LLC's intellectual property materials.

106. Tanase, individually, and or on behalf of ITSI, is wrongfully and without authorization assuming control, dominion and ownership of LLC's intellectual property materials.

Wherefore, AIR_IT, LLC, an Illinois limited liability company, respectfully requests that this Court enter Judgment in its favor and against IT Systems, International, LLC,  a Delaware limited liability company as follows:

A. An Entry of a Preliminary Injunction against IT Systems, International, as described in Count I;

B.  A demand for a return of LLC's intellectual property materials and trade

secrets, including any and all copies of such, to LLC within Three (3) calendar days of entry of said injunction.

C. Any other relief as this Court may deem fit.

## VIII.    COUNT III: BREACH OF OPERATING AGREEMENT AGAINST ITSI

1-106. Pleading in the alternative, LLC repeats, re-alleges and incorporates by reference paragraphs 1 through 106 of the Factual Allegations, Counts I and II, as paragraphs 1-106 of this Count III, as though fully set forth herein.

*Failure to Pay Unit Payments*

107. AIR and ITSI each owned designated 500,000 Units, respectively.

108. AIR and ITSI had an obligation to pay for said the designated Units.

109. AIR and ITSI orally agreed that the contribution would be paid in two phases.

110. Phase I would require AIR and ITSI each to pay an initial $500.00 on or before February 18, 2004.

111. Phase II would require AIR and ITSI to each pay an additional $25,000.00 by no later than June 30, 2004.

112. AIR paid for the Units the amount of $25,500.00.

113. ITSI failed to pay for any Units.

114. LLC repeatedly demanded from ITSI that it pay the requisite Unit amounts.

*Failure to Perform Contributions*

115. Additionally, per the OA, ITSI had to contribute the following:

(a) B2B platform for corporate cards system in the form of know-how, software installation of the System at the chosen site, which will start to be marketed as AIR Card System;

14

(b) technical support;

(c) technical information and all intellectual property rights required for the ("LLC") to fulfill its purpose as defined in section 4.1.

116. ITSI failed to fully and timely perform the contributions required by the OA.

117. ITSI failed to develop the B2B platform for corporate cards system in the form of know-how to LLC.

118. ITSI failed to install the AIR Card System on LLC's servers and to register it as LLC's trademark and or copyright.

119. ITSI failed to provide full technical support to LLC.

120. ITSI failed to contribute to LLC the technical information and software, intellectual property materials per Section 4.1 of the OA.

121. ITIS outsourced the labor, of the software to a Romanian company.

122. It became apparent over time that ITSI was limited in its ability to develop the software.

123. As such, AIR contributed significantly to the development of ATBS Billing System, ATBS Provisioning System, and the AIR card.

124. As such, ITSI failed to fully and timely adhere to the OA's contribution requirements.

*Abandonment*

125. On or about July 2006, ITSI abandoned its member position from LLC, by Tanase fleeing and abandoning the United States, without prior notice to LLC.

126. ITSI was solely managed and owned by Tanase; as such ITSI functioned and operated through Tanase.

127. Tanase's abandonment resulted in ITSI's abandonment of ITSI's member position with LLC.

128. LLC has attempted to communicate with ITSI, through Tanase, on numerous occasions.

129. ITSI failed to respond to any of LLC's communications.

130. ITSI's abandonment and failure to communicate amounted to an express will to withdraw from LLC.

*Failure to Discharge Duties*

131. ITSI failed to discharge its duties to LLC when it abandoned its member role.

132. TSI, as a member of the LLC, had a fiduciary duty t LLC to perform to the interests of LLC.

133. By failing to properly transfer the responsibilities of ITSI to LLC, upon its abandonment, ITSI breached its fiduciary duty to LLC.

134. Without the proper transfer of control, ITSI failed to transfer documents, information or knowledge in ITSI's possession of material matters relating to LLC's financial, legal, and economic status.

135. Such information was vital to the financial, legal and economic stability of LLC.

136. Without such information, LLC was placed at great financial, legal and economic risk.

137. LLC repeatedly demanded from ITSI that it discharge its duties in the appropriate manner by transferring the control of documents and information to

LLC.

### *Purloining of Intellectual Property Materials and Trade Secrets*

138. Upon his abandonment, Tanase, individually and or on behalf of ITSI, converted and purloined inter alia, LLC's intellectual property materials and trade secrets by taking, without authorization or consent from LLC, LLC's intellectual property, including but not limited to, ATBS Billing System, ATBS Provisioning System, and the AIR card.

139. Tanase, individually and or on behalf of ITSI, converted and purloined LLC's intellectual property materials and trade secrets, in contravention of Section 16.2-3 of the OA.

140. Despite repeated demands by  LLC, Tanase, individually and or on behalf of ITSI, has failed and or refused to return the intellectual property materials and trade secrets to LLC.

141. From July 2004, LLC attempted to communicate with LLC regarding its abandonment, the failure to discharge ITSI's obligations, the financial obligations and the return of LLC's intellectual property materials and or trade secrets.

142. ITSI and or Tanase refused to respond to any such communications and has refused to return the intellectual property.

### *Failure to Pay Share of Expenses*

143. To date, LLC incurred the approximate expenses amounting to Four Hundred Thousand Dollars and Zero Cents ($400,000.00).

144. Of said amount, approximately $200,000 is attributable as ITSI's share of

the expenses incurred, per Section 8.6 of the OA.

145. Since ITSI became a member of the LLC, ITSI failed to conform to the OA
and pay its equal share of LLC's expenses.

146. AIR and LLC have repeatedly demanded from ITSI its equal share of the
expenses.

147. LLC is entitled to interest on the money withheld by ITSI per 815 ILCS
205/2 provides as follows:

"Creditors shall be allowed to receive [interest] at a rate of five percentum (5%)
per annum . . . on any money withheld by an unreasonable and vexatious delay in
payment.

148. ITSI's refusal to pay LLC is unreasonable and vexatious because,
including but not limited to:

      (a) LLC has abided by the terms of the OA;
      (b) ITSI benefited and continues to benefit from not having paid said
      expenses by retaining the moneys owed and using said funds for other
      means contrary to the interest of the LLC;
      (c) LLC has made repeated demands for the amounts due and owing; and
      (d) ITSI has unlawfully and without cause withholding LLC'S payment
      for services rendered; and
      (g) ITSI'S failure to pay.

149. 770 ILCS 60/17 allows LLC to be awarded attorneys' fees against ITSI if
ITSI has failed to pay, and ITSI has failed to be paid, without just cause or right.

ITSI'S failure to pay LLC is without just cause or right, for the reasons below:

      (a) LLC has abided by the terms of the OA;
      (b) ITSI benefited and continues to benefit from not having paid said
      expenses by retaining the moneys owed and using said funds for other
      means contrary to the interest of the LLC;
      (c) LLC has made repeated demands for the amounts due and owing; and
      (d) ITSI has unlawfully and without cause withholding LLC'S payment;
      and
      (g) ITSI's failure to pay.

Wherefore, AIR_IT, LLC, an Illinois limited liability company, respectfully requests that this Court enter Judgment in its favor and against IT Systems, International, LLC, a Delaware limited liability company as follows:

A.    ITSI breached the OA by failing to pay the requisite sums for the 500,000 Units owned by ITSI per the OA;

B.    ITSI breached the OA by failing to perform its service contributions to LLC, as required by OA;

C.    ITSI breached the OA by ITSI, via Tanase, abandoned its member position when Tanase fled the country without notice;

D.    ITSI breached the OA when ITSI failed to discharge its member duties when OA by ITSI, via Tanase, abandoned its member position when Tanase fled the country without notice;

E.    ITSI breached the OA when it purloined the intellectual property materials and trade secrets belonging to LLC, per the express terms of the OA;

F.    ITSI breached the OA when it failed to pay its 50% share of expenses to LLC.

G.    ITSI breached the OA when it repeatedly ignored and refused to respond to LLC's communications in relation to such breaches;

H.    Based on said breaches, LLC properly and validly filed the Articles of Amendment withdrawing ITSI as a member;

I.    A determination that ITISI is no long a 50% member of LLC;

J.    A money judgment in the amount of Two Hundred Thousand Dollars and Zero Cents ($200,000.00) plus costs, attorneys' fees and prejudgment interest against ITSI reflecting its 50% share of LLC's expenses;

K.    Any such further relief as is just and proper.

## IX.    COUNT IV: BREACH OF FIDUCIARY DUTY PURSUANT TO 805 ILCS 180/15-3 AGAINST ITSI.

1-149. Pleading in the alternative, LLC repeats, re-alleges and incorporates by reference paragraphs 1 through 149 of the Factual Allegations, Counts I,

II, and III as paragraphs 1-149 of this Count IV, as though fully set forth herein.

150. ITSI, as a member of LLC had a duty of loyalty to the member-managed LLC and to AIR. *See* 805 ILCS 180/15-3(b).

151. ITSI, as a member of LLC had a duty of loyalty to the member-managed LLC and to AIR to account to LLC and to hold as trustee for it any property, profit, or benefit derived by ITSI  or derived from a use by ITSI of LLC's property, including the appropriation of LLC's opportunity. *See* 805 ILCS 180/15-3(b)(1).

152. ITSI breached this duty fiduciary duty when it usurped and purloined and refused to return, despite LLC's repeated demands herein, LLC's intellectual property materials and trade secrets, which intellectual property materials expressly are assets of LLC.

153. ITSI, via Tanase, usurped and purloined LLC's intellectual property materials with the intention of relying on said materials in a competitive nature against LLC, and contracting and or selling said intellectual property materials to third  parties and profiting from such sales.

154. ITSI, as a member of LLC had a duty of loyalty to the member-managed LLC and to AIR to refrain from competing with LLC in the conduct of LLC's business. *See* 805 ILCS 180/15-3(b)(3).

Wherefore, AIR_IT, LLC, an Illinois limited liability company, respectfully requests that this Court enter Judgment in its favor and against IT Systems, International, LLC, a Delaware limited liability company as follows:

A.     ITSI breached its fiduciary duty to LLC by failing to perform its service contributions to LLC, as required by OA;

B.     ITSI breached its fiduciary duty to LLC by ITSI, via Tanase, abandoned

its member position when Tanase fled the United States of America without notice;

C.    ITSI breached its fiduciary duty to LLC when ITSI failed to discharge its member duties when OA by ITSI, via Tanase, abandoned its member position when Tanase fled the United States of America without notice;

D.    ITSI breached its fiduciary duty to LLC when it purloined the intellectual property materials and office equipment belonging to LLC, per the express terms of the OA;

E.    ITSI breached its fiduciary duty to LLC when it failed to pay its 50% share of expenses to LLC;

F.    ITSI breached its fiduciary duty to LLC when it repeatedly ignored and refused to respond to LLC's communications in relation to such breaches;

G.    Based on said breaches, LLC properly and validly filed the Articles of Amendment withdrawing ITSI as a member;

H.    A determination that ITISI is no long a 50% member of LLC;

I.    An order that ITSI return to LLC within Three (3) days of entry of this Order all of LLC's intellectual property materials;

J.    Any such further relief as is just and proper.

## X.    COUNT V: BREACH OF FIDUCIARY DUTIES AGAINST TANASE

1-154. Pleading in the alternative, LLC repeats, re-alleges and incorporates by reference paragraphs 1 through 154 of the Factual Allegations, Counts I, II, III and IV, as paragraphs 1-154 of this Count V, as though fully set forth herein.

155. Tanase was the CEO of LLC.

156. Tanase was appointed as CEO on his representations that he had substantial experience in management, control, monitoring the performance of and ensuring internal control of companies.

157. LLC paid Tanase for his services as a CEO.

158. Tanase in his capacity of CEO of LLC held a position of trust, responsibility and confidence towards the LLC and owed the LLC a fiduciary duty of loyalty.

159. Tanase had the fiduciary duty to perform his obligations and responsibilities as the CEO of LLC.

160. Among those duties and responsibilities, were to manage the day-to-day business affairs, manage, control, monitor performance and ensure the internal control of LLC.

161.    Tanase failed to perform those duties and responsibilities.

162. LLC repeatedly requested that Tanase perform said responsibilities and duties.

163. Tanase ignored LLC's demands.

164. As a result of Tanase's failure to perform his CEO duties, Dorel Nasui, President of AIR, had to assume the responsibilities of the CEO.

165. As a CEO of LLC, Tanase owed LLC a duty of loyalty.

166. As a CEO of LLC, Tanase had a fiduciary duty of loyalty to LLC not to actively exploit his position within LLC for his own personal benefit or hinder the ability of LLC to continue the business for which it was developed.

167. Tanase breached this duty of loyalty when he converted and purloined the LLC's intellectual property materials and trade secrets in contravention of Section 16.2-3 of the OA.

168. As such, Tanase, in his position of trust and confidence, as a CEO, acted to the detriment of LLC in breach of his fiduciary duty to LLC, by misappropriating LLC's trade secrets, other confidential information and intellectual property

materials usurping LLC's business opportunities, actively acting to compete against LLC, to deprive LLC of business and good will.

169. Tanase failed to discharge his duties to LLC when he abandoned his CEO position.

170. Tanase, as the CEO of LLC, had a fiduciary duty to LLC to perform to and protect the interests of LLC.

171. By failing to properly transfer the responsibilities of Tanase to LLC, upon his abandonment, without notice, Tanase breached his fiduciary duty to LLC.

172. Without the proper transfer of control, Tanase failed to transfer documents, information or knowledge in Tanase's possession of material matters relating to LLC's financial, legal, and economic status.

173. Without such material information, LLC was placed at great financial, legal and economic risk.

174. As a direct result of Tanase's breach of his duty to perform his responsibilities and his breach of loyalty to LLC, LLC has suffered and will continue to suffer damages and has been and will continue to be irreparably harmed.

Wherefore, AIR_IT, LLC, an Illinois limited liability company, respectfully requests that this Court enter Judgment in its favor and against IT Systems, International, LLC, a Delaware limited liability company as follows:

A.    Tanase breached its fiduciary duty to LLC by failing to perform hi CEO duties and responsibilities;

B.    Tanase breached breached its fiduciary duty to LLC by Tanase abandoning his CEO position when Tanase fled the country without

notice;

C.     Tanase breached its fiduciary duty to LLC when he failed to discharge its CEO duties when Tanase, abandoned his CEO position when Tanase fled the country without notice;

D.     Tanase breached its fiduciary duty to LLC when it purloined the intellectual property materials and trade secrets belonging to LLC, per the express terms of the OA;

E.     Tanase breached his fiduciary duty to LLC when he repeatedly ignored and refused to respond to LLC's communications in relation to such breaches;

F.     A reimbursement of the salary paid by LLC to Tanase for his CEO of LLC.

G.     Any such further relief as is just and proper.

## X.   COUNT VI: MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION AGAINST ITSI AND TANASE.

1-174. Pleading in the alternative, LLC repeats, re-alleges and incorporates by reference paragraphs 1 through 174 of the Factual Allegations, Counts I, II, III, IV and V, as paragraphs 1-174 of this Count VI, as though fully set forth herein.

175. The ATBS Billing System and the ATBS Provisioning System/materials were to be marketed to Motorola TETRA systems under the private label of AIR TETRA BILLING SYSTEM AND AIR TETRA PROVISIONING SYSTEM.

176. The ATBS Billing, ATBS Provisioning System, and AIR card contained software programs, source codes and other technical data that were developed by LLC and or for the benefit of LLC in secret and confidence.

177. Said ATBS Billing, ATBS provisioning materials, and AIR card were a trade secret which was not known to others and was intended to be registered as LLC's copyright and or trademarks.

178. Said ATBS Billing, ATBS provisioning materials, and AIR card were LLC's trade secret which had an economic value, actual or potential, from not being known to the general public.

179. Said ATBS Billing, ATBS provisioning materials, and AIR card were confidential in nature.

180. LLC has taken reasonable precautions to protect the confidentiality of its trade secrets and other confidential business information.

181. Limited personal had access to the trade secrets.

182. Said trade secrets were protected from third parties by making it difficult to acquire or duplicate the trade secrets.

183. The trade secrets were developed in a restricted and limited environment.

184. Tanase was entrusted during the scope of his employment as the CEO of LLC and as the sole representative of ITSI.

185. Tanase, individually and on behalf of ITSI, relied upon his position as a CEO to acquire and usurp said trade secrets.

186. Tanase, individually and on behalf of ITSI, has knowingly acquired and misappropriated LLC's trade secrets and other confidential information has used them, or intends to use them, improperly to secure new business and compete unfairly against LLC, has and will inevitably disclose or continue to disclose the LLC's trade secrets and other confidential information to third parties which will benefit Tanase, ITSI, or its assignee, to the detriment of LLC.

187. Tanase, individually and on behalf of ITSI, has and or will profit from the unlawful actions, and as a result of Defendants' misappropriation, LLC has

suffered and will continue to suffer substantial and irreparable harm and injury,

for which there is no adequate remedy at law.

188. As a result of Tanase's misappropriation, individually and on behalf of ITSI,

LLC has suffered and will continue to suffer damages, including but without

limitation, lost profits.

Wherefore, AIR_IT, LLC, an Illinois limited liability company, respectfully

requests that this Court enter Judgment in its favor and against IT Systems,

International, LLC, a Delaware limited liability company as follows:

A. An Entry of a Preliminary Injunction against IT Systems, International
seeking to:

> (i) enjoin and restrain ITSI and Tanase and all persons In active concert or participation with them from directly or indirectly transferring, copying, disclosing, divulging or using in any form the LLC's intellectual property materials and trade secrets;

> (ii) Requiring  ITSI And Tanase and all persons in active concert or participation with them to take all the steps necessary to recover and or retrieve and then secure any and all copies of LLC's intellectual property materials and trade secrets;

> (iii) A demand for a return of LLC's intellectual property materials, including any and all

B.  An Order of Confidentiality;

C. Any other relief as this Court may deem fit.

Respectfully submitted;

AIR_IT, LLC, an Illinois limited liability company,

By: _____
    Ioana Sălăjanu

One of its Attorneys

Law Offices of Ioana Sălăjanu
101 N. Wacker, St 101
Chicago, IL 60606
312.377.5750
Att. ID. 42075

# VERIFICATION

STATE OF ILLINOIS             )
                                    ) ss:

COUNTY OF COOK            )

I, Dorel Nasui, being first duly sworn upon his oath, deposes and says:

      I am the President of American International Radio, Inc., a member of AIR_ IT, LLC, whose principal place of business is in Rolling Meadows, Illinois. I declare under penalties of perjury, the undersigned, certifies that the statements set forth herein in this Complaint are true and correct, except as to matters herein which are based upon information and belief, and as to such matters the undersigned believes them to be true.

                                           Dorel Nasui

| STATE OF ILLINOIS, COUNTY OF COOK | | ss. |
| --- | --- | --- |

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, CERTIFY THAT Dorel Nasui, personally known to me to be the same person(s) whose name(s) are subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that they signed, sealed and delivered the said instrument as their free and voluntary act, for the uses and purposes therein set forth.

| Given under my hand and official seal, this | 9 | day of | Nov | , 20 | 07 | . |
| --- | --- | --- | --- | --- | --- | --- |

| Commission expires | | 12 / 18 | , 20 | 10 | . |
| --- | --- | --- | --- | --- | --- |

_____(Notary Public)

OFFICIAL SEAL
ADRIAN I. ANTAL
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXPIRES 12-18-2010

**EXHIBIT A**

*c086.272.7*

# Delaware

PAGE 1

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "IT SYSTEMS INTERNATIONAL LLC" IS
DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN
GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF
THIS OFFICE SHOW, AS OF THE TWENTY-SIXTH DAY OF FEBRUARY, A.D.
2004.



*Harriet Smith Windsor*

Harriet Smith Windsor, Secretary of State

3746196   8300

040131267

AUTHENTICATION: 2956329

DATE: 02-26-04

EXHIBIT B

OPERATING AGREEMENT

OF

AIR_IT, LLC

Between the Founding Members:

## AMERICAN INTERNATIONAL RADIO, INC.

and

## IT SYSTEMS INTERNATIONAL, LLC.

*Dated January 09, 2004*

AIR_IT, LLC CONFIDENTIAL

# I N D E X

PAGE
1      DEFINITIONS                                          4
2      NEW COMPANY                                          5
3      CAPITALIZATION                                       5
4      PURPOSE AND BUSINESS OF COMPANY                      7
5      BOARD OF DIRECTORS                                   7
6      MEMBERS                                             11
7      OFFICERS AND PRINCIPAL MANAGERS                     12
8      FINANCIAL MATTERS                                   12
9      FINANCIAL PLAN                                      12
10     RETURN OF INVESTMENT AND DIVIDEND POLICY            13
11     EMPLOYMENT POLICIES                                 13
12     TRANSFER AND ENCUMBRANCE OF UNITS                   14
13     CLOSING                                             16
14     CONFIDENTIALITY                                     17
15     NON COMPETITION                                     17
16     TRADEMARKS AND TRADENAMES                           18
17     TERMINATION                                         18
18     REPRESENTATIONS AND WARRANTIES                      19
19     MISCELLANEOUS                                       19

Appendix A - Initial Financial Plan
Appendix B - Register of Members
Appendix C - Contribution of Members

AIR_IT, LLC CONFIDENTIAL

OPERATING AGREEMENT

AIR_IT LLC

AN ILLINOIS LIMITED LIABILITY COMPANY

This Limited Liability Company Agreement is made as of the January 9, 2004 (the "Effective Date") by and among:

*AMERICAN INTERNATIONAL RADIO INC.*, a company organized under the laws of the State of Illinois, USA with a principal place of business at 3601 Algonquin Road, Suite 320, Rolling Meadows, Illinois, 60008 USA ("AIR"), and,

*IT SYSTEMS INTERNATIONAL, LLC*, a company organized under the laws of the State of Delaware, with a principal place of business at 3601 Algonquin Road, Suite 320, Rolling Meadows, Illinois, 60008 USA ("ITS")

(All the above may hereafter in this Agreement shall be sometimes referred to individually as a "Party" and collectively as the "Parties" or "Founding Members").

AND ANY AND ALL ADDITIONAL PERSONS OR BUSINESS ENTITIES who have entered into this Agreement (the "New Members"), as evidenced by authorized signature on Appendix B, which is attached and made a part hereof.

All of the above may hereafter in this Agreement be sometimes referred to individually as a "Member" and collectively as the "Members."

Unless defined immediately where used, capitalized terms are defined in Section 1.

WHEREAS, the Founding Members desire (directly or through wholly-owned subsidiary) to form a joint venture under the laws of either the state of Illinois or the state of Delaware in the USA (the "Company") to develop its own software systems, to provide outsourcing services for data and software production ("Systems") in North America and elsewhere on a case-by-case basis under a separate agreement ("Territory"), market them and provide related services worldwide;

WHEREAS, the Founding Members have agreed that the operation of the above services shall be carried out exclusively through the Company;

WHEREAS, The Founding Members wish to encourage investment in the Company by additional individuals and entities, who shall be Parties to this Agreement and Members in the Company.

AIR_IT, LLC CONFIDENTIAL

**WHEREAS,** the Parties herein set forth certain terms and conditions governing their relationship as Members in the Company.

**NOW, THEREFORE,** in consideration of the mutual promises and undertakings contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    <u>DEFINITIONS</u>

As used herein, capitalized terms have the following meanings:

Advisory Board - a council of external business experts recruited to advise the Company on business and technology issues;

Affiliate - in relation to any company, a wholly owned subsidiary of that company, the holding company owning all of the voting securities, on a fully diluted basis, of that company or a wholly-owned subsidiary of that holding company;

Agreement - this Operating Agreement;

Annual Financial Plan - The annual budget of the Company, which shall be set forth as the first of each current Five Year Financial Plan;

Board - the Board of Directors of the Company;

Bylaws - the bylaws of the Company formulated in accordance with Illinois law and as amended in accordance with this Agreement and in effect from time to time;

Company - AIR_IT LLC, an Illinois Limited Liability Company (the "Company");

Competitor - is any entity (other than a Member) providing mobile asset management services;

Director - a member of the Board;

Five Year Financial Plan - the financial plan of the Company, including annual budgets relating to income, capital expenditures, operating expenses and cash flow, from time to time approved by the General Assembly of Members as provided in Section 6.

Full Buy Out - the rights of one Member to purchase Units of the other Member in accordance with Section 12.8.

AIR_IT, LLC CONFIDENTIAL

Founding Members - the Founding Members, as identified in the introductory section of this Agreement, and as set forth in Section 3.2.

GAAP - generally accepted accounting principles consistently applied and in effect from time to time in the United States and elsewhere.

Initial Percentage Ownership - the percentages of Units owned by the Members as noted in Section 3.2. and as set forth in Appendix B.

Majority - shall be as defined as follows:

    Absolute Majority    - means 50% + 1 of those eligible to vote;
    Simple Majority    - means 50% + 1 of those present at the meeting at which a vote takes place; and
    Special Majority - has the meaning agreed specifically assigned to it by the parties.

Member - any of the Parties hereto or their permitted transferees or any other person who becomes a member of the Company and a party to this Agreement individually, and Members means them collectively;

Percentage Ownership - with respect to a Member, the percentage of the total outstanding Units owned by such Member.

Person - an individual, corporation, partnership or other legal entity;

Units - the paid up units of stock of the Company issued and outstanding at any time;

Reference to a Section means a section of this Agreement, and reference to an Article means an article of the Bylaws of the Company;

Amounts stated in US dollars or other currency shall mean equivalent amount in any other currency.

AIR_IT, LLC CONFIDENTIAL

2.    NEW COMPANY

2.1.    Formation. The Parties hereby form a Limited Liability Company under the laws of the State of Illinois and subject to the provisions of the Limited Liability Company Act as currently in effect as of this date. A Certificate of Formation shall be filed with the Secretary of State. The name of the company shall be AIR_IT, LLC. The registered office of the Company shall be at 3601 Algonquin Road, Suite 320, Rolling Meadows, Illinois, 60008 USA.

2.3.    Bylaws. The Bylaws of the Company shall be in a form acceptable in the state in which the Company is registered. If necessary, the Parties agree to amend the Bylaws so that all material aspects of the Company Bylaws shall at all times be consistent with the terms and conditions of this Agreement, and the Members agree to take all the reasonable and necessary steps to amend the Bylaws for such purpose.

2.4.    Refund of Fees and Expenses. Registration fees and other incorporation expenses (including legal fees), and any other funds advanced by a Party and incurred in connection with the incorporation of the Company shall be refunded by the Company to the Members who advanced them immediately after the capitalization of the Company.

2.5.    Contribution of the Parties. In exchange for their respective ownership interests in the Company, the Members agree to contribute to the Company assets such as cash, operating expertise, intellectual property licenses, and other good and valuable consideration ("Contributions of Members") as required for the Company to fulfill its purpose as described in section 4.1 below. A schedule defining the Contributions of Members is provided as Appendix C.

3.    CAPITALIZATION

3.1.    Authorized Units. The number of authorized units of membership of the Company is one million (1,000,000) ("Units"). The Units shall be of one class, and each unit shall be entitled to one vote. No other units, stock or other equity securities are authorized.

3.2.    Percentage Ownership. The Percentage Ownership of the Members shall be as reflected in Appendix B, as updated from time to time to reflect any changes or modifications thereto. It is envisioned that 10% of the Company's number of units, currently 100,000 units, will be reserved as incentive compensation for the Company's employees and members of the Company's Advisory Board and Board of Directors.

3.3.    Contribution. Contributions are specified in Appendix C. Unit ownership by the Members, as set forth in Section 13, is reflected in Appendix B. Failure by any

Case 1:07-cv-06612    Document 1    Filed 11/26/2007    Page 38 of 62

AIR_IT, LLC CONFIDENTIAL

Member to fulfill its obligations under this Agreement shall disqualify such entity from participation as a Member in the Company.

3.4.    New Member. The Members acknowledge that upon unanimous agreement they may decide to include another one or more other entities as members, in which case the Percentage Ownership shall be adjusted pro rata in accordance with the Percentage Ownership set forth in Appendix B, or as otherwise unanimously agreed. Nothing in this Section shall limit or affect the ability of a Member to transfer its Units pursuant to Section 12 of this Agreement. A new operating agreement shall be executed upon the addition of a new Member.

3.5.    Change in Member Status Not Affecting Legal Control. In the event that any two or more Members merge, consolidate or otherwise form a new legal entity (the "Amending Members") recognized under the laws of the state of incorporation of the new legal entity, the Register of Members shall be amended to reflect such new legal entity, and the provisions of Sections 12 of this Agreement shall not apply to prevent such amendment. Notwithstanding the foregoing, no amendment of the Register of Members may be made pursuant to this Subsection 3.5. if any new legal entity proposed to be reflected in the register consists of any new or additional Members, or is formed or organized in such a way as to restrict or change the legal obligations of the Members under this Agreement, the Contract of Association or bylaws, or law in the state of incorporation. The Amending Members shall cooperate fully with the Board in providing any and all documentation and other information reasonably available to verify the Amending Members' compliance with this Subsection.

3.6.    First Stage Funding

3.6.1.    The Members agree that increases in equity capital will be needed to develop and market the System, and to continue operations. The Members acknowledge and agree to the initial funding requirements set out in the Initial Financial Plan, attached hereto as Appendix A.

3.6.2.    Each Member shall contribute in cash for additional Units at estimated market value for the balance of the authorized capital identified in Subsection 3.1. the whole of which is reflected in the Initial Financial Plan as "First Stage Funding." Failure by any Member to subscribe to its proportionate unit of the balance of the authorized capital (in excess of the Initial Contribution) shall not constitute a breach under this Agreement, but shall result in dilution as provided in Section 3.7.3. below.

AIR_IT, LLC CONFIDENTIAL

3.7.    Additional Equity Funding

3.7.1.  After each Member makes its First Stage Equity contribution, subsequent increases in capital ("Unit Capital Increase(s)") shall be proposed by the Board and each Member agrees to vote its Units at a meeting of the General Assembly of Members to approve any amendment of the Bylaws necessary to authorize increases to the authorized unit capital of the Company, as proposed by the Board.

3.7.2.  As described in the Bylaws, Members shall have pre-emptive rights to subscribe in cash in any Unit Capital Increase to additional authorized Units in accordance with their Percentage Ownership. The Amount equal to the Unit Capital Increase multiplied by a Member's Percentage is such Member's First Round Call Amount. If the entire Unit Capital Increase is not subscribed to in the first round, the Member(s) that did subscribe to the full amount of its First Round Call amount may, within the next seven days, subscribe to the unsubscribed amount, in proportion to their Percentage Ownership.

3.7.3.  Failure by a Member to subscribe to its pro rata share in any subsequent Unit Capital Increase shall result in dilution of the proportionate unit ownership of such Member but shall not constitute an event of default under this Agreement.

3.8.    Debt

3.8.1.  It is the Members' goal that any debt will be provided externally without Member guarantees. If, however, in order for the Company to borrow money from bankers and others on terms acceptable to Company, the Members deem it necessary for such borrowings to be wholly or partially guaranteed, such guarantee shall be required upon unanimous approval of the Members and each Member's guarantee shall be limited to its Percentage Ownership of the aggregate amount guaranteed.

3.8.2.  Where loans from Members are to be made the Members shall by Absolute Majority determine the time, size and conditions of any such loans and shall lend the funds in accordance with their Percentage Ownership. Unless otherwise agreed with respect to a particular loan, any such Member loans made to the Company shall be repaid on a proportionate basis. All loans must be fully repaid before any dividend or similar distribution may be declared.

3.9.    Units Legend. Each Unit certificate shall conspicuously bear the following legend:
        The units represented by this certificate are subject to restrictions, including but not limited to, restriction on transfer, under an LLC Operating Agreement dated January 9, 2004, among the members of the limited liability corporation.

AIR_IT, LLC CONFIDENTIAL

## 4. THE PURPOSE AND BUSINESS OF COMPANY

4.1.    Purpose. It is the intent of the Members

(a) to develop and market the Company's proprietary Systems worldwide;
(b) to provide, to maintain and to operate the Systems; and
(c) to do all such other things incidental or conducive thereto as the Board may determine.

The Company intends to be active in the development, sales, and marketing of the computer related systems including but not limited to software applications, operations, installations, services and maintenances.

For operation, the preferred business model, but not limited to, is envisioned to be similar to that of an Application Service Provider (ASP), therefore the Company's Systems are envisioned to be developed in appropriate technologies.

4.2.    Business Relationship to Members: The company was created due to the identification the potential of a huge market if the members combine resources such as software development strength of ITS and the marketing and distribution capabilities of AIR.

AIR IT will produce software on demand and will provide software services primarily to AIR and any entity designated by AIR.

AIR IT may also use AIR distribution capabilities to sell its products worldwide under separate distribution agreements.

AIR IT will also distribute its product or services directly to other customers as under separate contracts.

AIR_IT, LLC CONFIDENTIAL

## 5.    BOARD OF DIRECTORS

5.1.    <u>Meetings</u>.    The Board shall consist of the Directors of the Company, who shall be responsible for supervising the activities of the Company and for determining the overall policies and objectives of the Company. Meetings of the Board shall be held at least quarterly, or more often if so required pursuant to applicable laws in the state of incorporation. Written notices of meetings shall be given by the Chairman to each Director at least 15 days in advance of the meeting or in accordance with the Bylaws, unless a fixed date is established for regular meetings. Meetings may be held at any location as agreed among the Directors, and any Director may participate in meetings via telephone or video-conferencing. Any Director may call for an extraordinary meeting of the Board upon no less than 15 days notice, subject to the unanimous consent of all the Directors, and any Director may attend an extraordinary meeting of the Board via telephone or video-conferencing.

5.2.    <u>Appointment</u>

a)    The Board shall consist of three (3) Directors, appointed for one (1)-year terms by the General Assembly of Members. Any Member who owns a Percentage Ownership in the Company of a minimum of 27% shall be entitled to nominate a member of the Board. Any two (2) or more Members shall have the right to combine their Percentage Ownership in order to qualify under the provisions of this Subsection 5.2. to nominate a member to the Board. In the event that less than three (3) Director are nominated by Members entitled to make such nomination, the remaining Director(s) shall be nominated and approved by Absolute Majority of the General Assembly of Members. In the event that the General Assembly of Members fails to approve the nomination of any Director nominated by any Member(s) pursuant to this Section 5.2. then such nominating Member shall have the right to nominate another candidate to the Board. This process shall be repeated until all Directors are approved . Notwithstanding the foregoing, it is expressly understood to be the intent of the Parties that for as long as the cumulative Percentage Ownership of the Romanian Members remain at the amount set forth in Appendix B, that they shall be entitled to nominate three members to the Board. Irrespective of the number of Units owned by a Founding Member, such Founding Member shall be entitled to appoint at least one member of the Board of Directors.

b)    The Chairman of the Board shall be chosen for a one (1)-year term on a rotating basis, from among the three (3) Board members. The Chairman shall be elected by Absolute Majority of all the Directors. In the event of a tied vote, or the lack of an Absolute Majority approval of any nominee, the Directors shall vote again for the election of the Chairman, and this process shall be repeated as necessary until a Chairman is elected.

5.3.    <u>Alternates Replacements</u>. An alternate Director for each Director appointed by a Member may be designated by the Member appointing such Director and the alternate Director may vote in that Director's absence and may always attend meetings. In the event an Director resigns or for

AIR_IT, LLC CONFIDENTIAL

any other reason vacates his position, the Member who appointed such Director may appoint a replacement Director.

5.4. <u>Remuneration</u>. The Directors shall not be entitled to be paid fees but shall receive such remuneration for executive services performed for the Company as the Board may decide. Directors may not be employees of the Company.

5.5. <u>Quorum</u>. Attendance in person or by proxy of an Absolute Majority Directors in office shall be required to constitute a quorum at any meeting of the Board.

5.6. <u>Majority Vote</u>. All matters properly brought before a meeting of the Board shall require approval by Absolute Majority of Directors in office, except as provided in Subsection 5.7. In the event the computation of percentages does not yield a whole number, the resulting number shall be rounded to the nearest whole number. The following matters are specifically within the exclusive jurisdiction of the Board and require a resolution passed by an Absolute Majority of all Directors in office:

    a)    any changes in the powers of the officers of the Company;

    b)    contracts involving payments to or by the Company, or any expenditures, commitments or capital dispositions in excess of US$ 50,000.00 for one item or a series of related items, including the entering into of any agreement for a term in excess of one year with expenditures of more than US$ 50,000.00 over the full term;

    c)    the incurring of any indebtedness in the ordinary course of business (whether current or term) in excess of US$ 25,000.00;

    d)    the expenditures of any sum in excess of US$ 5,000 not included in the then current Annual Financial Plan;

    e)    the entering into or modification or termination of any transaction or agreement, of a value in excess of US$ 5,000 between the company and any executive manager or Director of the Company or any Person affiliated with a Member, an Affiliate of a Member or an executive manager or Director thereof;

    f)    delegation of Board authority, including, but not limited to, the granting of powers of attorney;

    g)    establishment of personnel policies or practices of the Company or any significant modifications thereof;

    h)    the making of loans or advances or guarantees except in the ordinary course of business for employee travel and expense purposes; and

    i)    any decision to enter into discussions or negotiations involving labor relations issues.

5.7. <u>Director Supermajority Vote</u>. The following matters require a resolution approved by a Supermajority of the Directors. "Supermajority" shall be defined for purposes of this Subsection 5.7. as an affirmative vote of two-thirds (2/3) of all of the Directors in office (and determined with respect to the total number of Directors, not just those in attendance) at a meeting of the Board. In the event the computation of percentages does not yield a whole number, the resulting number shall be rounded to the nearest whole number.

AIR_IT, LLC CONFIDENTIAL

a)  the consolidation of the Company or the sale, mortgage, lease, license, charge, lien, pledge or encumbrance of any of its assets, unless such assets are not a substantial portion of its assets and such transaction is in the ordinary course of business or the transaction is made in connection with the replacement of any assets sold;

b)  the acquisition of formation of any subsidiary entity or joint venture or the making of any investments in any other entity or business;

c)  the determination of the overall capital structure of the Company,   including both debt and equity, as appropriate from time to time;

d)  the borrowing of any sum (including the issuance of any debt instruments other than in the ordinary course of business;

e)  the granting of any security in assets of the Company (except with regard to any such security subject to the approval of the General Assembly of Members pursuant to Subsection 6.1.);

f)  establishment of financial and business objectives, approval of the Company's Five Year Plan, including the Annual Financial Plan, which shall contain the operating budget for such fiscal year, and revisions thereto, if any;

g)  the declaration and payment of any dividends or distribution of the Company;

h)  the granting of any guarantee or similar surety for the obligations of any corporation, partnership, entity or person regardless of whether such other entity is controlled by the Company;

i)  the approval of entering into or amendment of employment contracts between the Company and the Executive General Manager of the Company and all management personnel reporting directly to the Executive General Manger of the Company; and

j)  contracts and licenses for the acquisition or transfer of technology, copyrights, patents, trademarks or other intellectual property;

5.8. Lack of Director Supermajority. If a resolution requiring Supermajority approval is proposed and not agreed to by a Supermajority, the Chief Executive Officer of the Company may, and shall have the responsibility to, continue to manage the day-to-day affairs of the Company in the Company's sole best interest within the bounds of the specifically approved matters of the Company's then current Annual Financial Plan and any powers of attorney of the Executive General Manager of the Company or others, as approved by the Board.

5.9. Resolution

(a) In the event a resolution requiring Supermajority approval has been proposed at a meeting of the Board and has not been passed by such a Supermajority of the Board, unless such resolution is either withdrawn or otherwise dealt with to the satisfaction of a Supermajority of the Directors, said matter shall, upon written request of any Director given to the Board, be referred for resolution to a third party consultant with a background suited to the functional area closest to that of the resolution ("Consultant"). For example, a legal issue shall be referred to a lawyer; an accounting issue shall be referred to an accountant; a human relations issue shall be referred to a human relations

AIR_IT, LLC CONFIDENTIAL

consultant; et al. Choice of the external consultant shall be made by vote of the Board. In the event of a tie, the Chairman shall make choice of the consultant.

(b) As soon as practical, upon referral of said matter by the Board to the Consultant, the Consultant shall be retained to resolve said dispute within 30 working days of the referral.

(c) In the event that any dispute referred to the Consultant is not resolved at the end of the 30-day period the Members shall be free to pursue the sale of their units pursuant to Section 12.2, provided however that nothing in Section 5.8. shall be deemed to be a restriction of any Member's right to sell its units as provided in Section 12.2. at any time.

5.10.    _Board Agenda and Minutes_. The Board shall establish procedures for the determination of the agenda for Board meetings. Minutes of all meetings of the Board shall be kept in accordance with the laws of the state of incorporation.

5.11.    _Board of Advisors._ The Company shall recruit a Board of Advisors comprised of external experts for the purpose of advising the Company on business and technology issues, as well as introducing the Company to potential clients, managers, and investors. Each member of the Board of Advisors shall execute a non-disclosure agreement with the Company.

## 6. MEMBERS

6.1.    _Annual Meetings_. An annual meeting of the General Assembly of Members shall be held within the first three months of each year for the purposes of:

(a) approval of the annual report;

(b) appointment of the Directors;

(c) approval of the Company's Five Year Financial Plan, including the Annual Financial Plan, which shall contain the operating budget for such fiscal year, and revisions thereto, if any;

(d) approval of the pledge, lease or dissolution of any one of more subsidiaries of the Company;

(e) appointment of the independent fiscal auditors, who shall be member of an independent, qualified accounting firm of international repute, and

(f) such other matters as may be properly brought before the annual meeting.

6.2.    _Extraordinary Meetings_. All other matters to be decided by the Members may be decided at extraordinary meetings called as provided in the by-laws. The following matters shall require approval by the Members at an extraordinary meeting:

(a)    changes in the scope of the Company;

(b)    change in nationality of the Company;

(c)    increase or decrease of the authorized or outstanding capital;

(d)    change in fiscal year;

(e)    change in the principal managers;

(f)    change in the principal office of the Company;

AIR_IT, LLC CONFIDENTIAL

    (g)    change in the corporate form of doing business;
    (h)    merger with other Companies;
    (i)    early dissolution of the Company;
    (j)    issuance of bonds and similar obligations of the Company;
    (k)    any change in the Contract of Association or Bylaws;
    (l)    the voluntary ceasing of operations or liquidation of the Company; and
    (m)    any other decisions which requires the approval of the extraordinary general meeting.

6.3.    Quorum. Attendance in person or by proxy of the Members holding an Absolute Majority of issued and outstanding Units shall be required to constitute a quorum at both the annual meeting of the General Assembly and at an extraordinary meeting.

6.4.    Voting. All matters requiring approval by a vote of Members shall be approved by Absolute Majority, unless a greater majority is
    a)    required by the laws of the state of incorporation,
    b)    expressly provided for in this Agreement and reflected in the Bylaws, or
    c)    expressly agreed by the Members by amendment to this Agreement and the Bylaws. Each Unit shall be entitled to one vote in the General Assembly.

6.5. Limit on Voting Rights. Members who have not fully paid for their units may not vote with respect to such units at any meeting of the Members, whether ordinary or extraordinary.

6.6. Waiver of Notice Provisions. The Members may by unanimous consent hold a meeting, whether ordinary or extraordinary, and make decisions within the authority of the General Assembly, without the observance of the formalities otherwise required for the calling of such a meeting.

6.7. Limitation of Liability. The liability of the Members shall be limited as provided under the laws of the Illinois Limited Liability statutes. Members that are neither Officers nor Principal Managers shall take no part whatever in the control, management, direction, or operation of the Company's affairs and shall have now power to bind the Company. The Officers and Principal Managers may from time to time seek advice from the Members, but they need not accept such advice, and at all times the Managers shall have the exclusive right to control and manage the Company. No Member shall be an agent of any other Member of the Company solely by reason of being a Member.

## 7. OFFICERS AND PRINCIPAL MANAGERS

7.1. Officers. The Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, and Company Vice Presidents ("Officers") shall be nominated by the Board. The Board shall also nominate other officers at such time as it deems appropriate and necessary unless the Board has delegated such authority to the Chairman or Chief Executive Officer ("CEO") of the Company.

AIR_IT, LLC CONFIDENTIAL

7.2 <u>Powers of Officers</u>. Powers and responsibilities of Officers shall as defined in a separate document by the Board of Directors.

7.3 <u>Chief Executive Officer</u>. The CEO shall have primary responsibility for managing the operations of the Company and for effectuating the decisions of the Officers and Principal Managers (defined below).

7.4. <u>Principal Managers</u>. All other managers ("Principal Managers") of the Company shall be appointed by the Chairman or his delegate. All principal managers shall report to the CEO of the Company.

7.5 <u>Exculpation</u>. Any act or omission of an Officer or Principal Manager, the effect of which may cause or result in loss or damage to the Company or the Members, if done in good faith to promote the best interests of the Company, shall not subject the Officer or Principal Manager to any liability to the Members.

7.6 <u>Indemnification</u>. The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than by or in the right of the Company) by reason of the fact that he is or was a Member of the Company, Officer, Principal Manager, employee or agent of the Company, or is or was serving at the request of the Company, if the Members determine that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful.

7.7 <u>Records</u>. The Officers shall cause the Company to keep at its principal place of business the following:
   (a) a current list in alphabetical order of the full name and the last known street address of each Member;
   (b) a copy of the Certificate of Formation and the Company Operating Agreement and all amendments;
   (c) copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years;
   (d) copies of any financial statements of the limited liability company for the three most recent years.

7.8. <u>Company Information</u>. Upon request, the CEO or his delegate shall supply to any Member information regarding the Company or its activities. Each Member or his authorized representative shall have access to and may inspect and copy all books, records, and materials in the Company's

AIR_IT, LLC CONFIDENTIAL

possession regarding the Company or its activities. The exercise of the rights contained in this section 7.8 shall be at the requesting Member's expense.

7.9  Management Fee. Any Officer or Principal Manager rendering services to the Company shall be entitled to compensation commensurate with the value of such services.

7.10  Reimbursement. The Company shall reimburse the Officers or Principal Managers or Members for all direct out-of-pocket expenses incurred by them in managing the Company.

## 8. FINANCIAL MATTERS

8.1. Company Accounts. The Company shall maintain accurate and complete accounting records. The Accounts of the Company shall be kept in accordance with GAAP, and shall be audited annually. Audits additional to the annual audit shall be made if requested by any Member, but in such case shall be at the expense of the requesting Member. The Company shall maintain proper internal accounting controls sufficient to assure that all dispositions of assets of the Company will occur under management authority and to prevent unauthorized persons from having access to assets of the Company.

8.2. Members' Accounts. The Company shall maintain separate capital and distribution accounts for each Member. Each Member's capital account shall be determined and maintained in the manner set forth in Treasury Regulation 1.704-1(b)(2)(iv) and shall consist of his initial capital contribution increased by:
    (a) any additional capital contribution made by him/her;
    (b) credit balances transferred from his distribution account to his capital account;

and decreased by:
    (a) distributions to him/her in reduction of Company capital;
    (b) the Member's share of Company losses if charged to his/her capital account.

8.2. Fiscal Year. The fiscal year of the Company shall end on December 31 each year.

8.3. Fiscal Auditor. The fiscal auditors of the Company shall be an internationally recognized firm or such other qualified fiscal auditor as may from time to time be appointed by the Members pursuant to Section 6.2.

8.4. Inspection. Each of the Members shall have the right to inspect and copy from time to time the books and financial and other documents of the Company at its own expense. The Company shall make available in a timely manner financial information and reports of the Company, in the form and format reasonably requested by any Member.

8.5. Reports. The Executive Manager General of the Company shall prepare and submit to each Director monthly management and financial reports, consisting of at least a profit and loss statement and a balance sheet and information concerning any other material matter.

AIR_IT, LLC CONFIDENTIAL

8.6. Profits/Losses. For financial accounting and tax purposes the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Appendix B as amended from time to time in accordance with Treasury Regulation 1.704-1.

8.7 Distributions. The Members shall determine and distribute available funds annually or at more frequent intervals as they see fit. Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Board. Distributions in liquidation of the Company or in liquidation of a Member's interest shall be made in accordance with the positive capital account balances pursuant to Treasury Regulation 1.704-1(b)(2)(ii)(b)(2). To the extent a Member shall have a negative capital account balance, there shall be a qualified income offset, as set forth in Treasury Regulation 1.704-1(b)(2)(ii)(d).

8.8 Reports. The Company shall close the books of account after the close of each calendar year, and shall prepare and send to each member a statement of such Member's distributive share of income and expense for income tax reporting purposes.

8.9 Nominee. Title to the Company's assets shall be held in the Company's name or in the name of any nominee that the Managers may designate. The Managers shall have power to enter into a nominee agreement with any such person, and such agreement may contain provisions indemnifying the nominee, except for his willful misconduct.

## 9. FINANCIAL PLAN

9.1. Initial Financial Plan. Members shall cause their respective appointed Directors to approve the initial Five Year Financial Plan for the Company, attached hereto as Appendix A, at the first meeting of the Board of the Company.

9.2. Subsequent Plans. Following the approval of the initial Five Year Financial Plan, the following procedure shall be followed in preparing all subsequent Five Year Financial Plans: (60) days before the beginning of each fiscal year of the Company, a Five Year Financial Plan commencing with such fiscal year shall be prepared by the Executive Manager General and presented to the Board for its approval. If, at the beginning of any fiscal year, the Board has not approved an updated, current Five Year Financial Plan for that fiscal year, then the Five Year Financial Plan previously approved shall continue in effect and shall be used as the Financial Plan for those fiscal years until the Board approves a new Five Year Financial Plan.

## 10. RETURN OF INVESTMENT AND DIVIDEND POLICY

10.1.    Return of Investment. The Company's objectives shall be to provide a rate of return on capital invested that will adequately compensate the parties for their investment. The goal of the parties is that the annual rate of return after taxes shall be more than 20% on invested capital. The parties acknowledge that this goal may be revised from time to time and that the failure to reach

AIR_IT, LLC CONFIDENTIAL

this goal, or any subsequent objectives as set forth in any approved Five Year Financial Plan, shall not be grounds for termination of this Agreement.

10.2.    Dividends. Subject to the projected requirements of the business of the Company, and subject to the legal requirements in the state of incorporation, over the 12 month period following the date at which a dividend is being considered, including but not limited to, investment and expansion plans, the Members agree that all funds reasonably available for distribution to Members shall be distributed by way of a dividend, or other form of distribution approved by the Board. No dividend or other form of distribution may be declared until outstanding loans are repaid in full.

## 11.    EMPLOYMENT POLICIES

11.1.    The Company shall seek to deal directly with its employees and will cause the adoption of such personnel policies and practices as appropriate in order reasonably to achieve such results, at all times in compliance with applicable state and federal laws.

11.2.    The Company shall seek to develop personnel practices that fairly reward employees for services rendered in a manner consistent with common business practices in the state of incorporation.

11.3.    Services of Members' Employees. From time to time, upon approval of the Board, a Member may make one or more of its employees available to the Company on a contract, or consulting basis. In such case, the services of such a person shall be provided to the Company pursuant to a service contract in form and substance acceptable to the Members but all consulting employees shall all times remain employees of the Member which provides them for all purposes, including for example, employment, termination of employment, payment of wages or salary, benefits and personnel policy. Unless specifically agreed to the contrary, the service contract shall provide that the Company shall reimburse the Member monthly for all costs and expenses of the employee and related to the employment of the employee including, for example, compensation costs, salary, bonus, retirement benefits, insurance and other benefits, travel, as well as other expenses not reimbursed directly to the consulting employee by the Company. The service contract will state the expenses to be paid.

11.4.    No Hire Policy. The Company shall not seek to hire away a Member's employee without such Member's express consent. Likewise, no Member shall seek to hire away any Company employee without the expenses consent of the Board of the Company.

AIR_IT, LLC CONFIDENTIAL

## 12.    TRANSFER AND ENCUMBRANCE OF UNITS
A transfer of the Company by any Member shall be subject to the following restrictions.

### 12.1.    Transfer to Affiliates

12.1.1. A Member may at any time transfer units to an Affiliate provided that any transfer of less than all of the units shall require the unanimous approval of the Members, which approval shall not be unreasonably withheld. Additionally, any transfer to an Affiliate is subject to the requirement that

    (a)   the Affiliate agrees to be bound by the terms of this Agreement, and

    (b)   such Member remains responsible to the other Member for the actions of its Affiliate, including compliance with this Agreement.

12.1.2. In the event an Affiliate to which Units have been transferred ceases to be an Affiliate of the transferring Member, then such Affiliate shall, upon or prior to ceasing to be an Affiliate, transfer such Units back to the Member from which it acquired the Units.

### 12.2.    First Refusal Rights. All transfers of units, except transfers pursuant to Subsection 12.1. are subject to the rights of the other Members ("Remaining Members") to purchase all or any part of such units ("First Refusal Right").

### 12.3.    Transfers Within 24 Months of Company Formation

No Member may sell or otherwise transfer all or any part of its Units in the Company to a third party within the initial twenty-four (24) months following the formation of the Company without a affirmative vote of two-thirds of the Members approving such transfer. All transfers of interest, except transfers pursuant to Subsection 12.1., are subject to the First Refusal Rights of the other Members ("Remaining Members"). Any Units transferred within 24 months following the formation of the Company, whether to the Remaining Members or to a third party, shall be sold at net book value as defined in Section 12.9., unless otherwise approved by two-thirds (2/3) of the Remaining Members. All transfer transactions undertaken pursuant to this Subsection 12.3. shall be subject to the same notice provisions and time requirements set out in Subsection 12.4.

### 12.4.    Transfers More Than 24 Months After Company Formation

    (a)   In the event a Member ("Selling Member") desires to transfer all or any part of its Units to a person other than an Affiliate and has received a bona fide offer from such proposed transferee, or has not received a bona fide offer but nonetheless desires to sell all or part of its Units, such Selling Member shall first deliver notice to the Remaining Members of its intention to transfer ("Offer Notice") together with a certified copy of the offer, if any, and if interested, the Remaining Members may exercise their First Refusal Rights pursuant to Subsection 12.4.(b) below, and purchase such Units.

    (b)   A Remaining Member has the option to exercise its First Refusal Rights by giving notice to the Selling Member of intention to purchase the Selling Member's Units ("Option Exercise Notice") within 30 days after receipt of the Offer Notice. The

AIR_IT, LLC CONFIDENTIAL

purchase shall be made within 30 days after giving the Option Exercise Notice. The purchase will be made in cash on the same terms as the Selling Member proposed to sell the Units to the non-Affiliate or as otherwise agreed by the parties.

(c)  If the First Refusal Right is not exercised within the 30 days provided for in Subsection 12.4.(b), the Selling Members may sell its units to the proposed transferee, if any, at the same price and on the same terms contained in the proposed transferee's offer, within 60 days thereafter. If there is no bona fide third party offer, and the Remaining Members have not expressed an interest in the price set forth in the Offer Notice, the Selling Member may negotiate an acceptable price with any interested Remaining Members, provided, however, that any purchase of such Units by any of the Remaining Members shall be on a pro rata basis pursuant to Section 12.5. below. It is expressly understood that upon receipt of any offer (whether by a third party or by a Remaining Member), a Selling Member shall always be obliged to give notice under Subsection 12.4.(a) above, and permit the Remaining Members to exercise their First Refusal Rights with respect to such offers.

12.5.    Pro Rata Exercise. The option of the Members to purchase Units under Subsection 12.3., 12.4. and 12.7. shall be exercisable proportionately in accordance with their Percentage Ownership at the time of the offer Units. In exercising any purchase option under Section 12.3., 12.4., or 12.7., a Member may purchase all, but not less than all, of its pro rata share of the number of Units proposed for sale by the Selling or Offering Member in its Offer Notice, as applicable (its first round pro rata share). If less than all of the Members exercise their options, those Members that did exercise their options may, within the next five days, elect to purchase to offered Units for which options were not exercised, in proportion to their Percentage Ownership. This process shall be repeated until the entire amount of offered Units are purchased or until no Member will elect to purchase any further offered unit, at which time the offer shall be deemed to have expired.

12.6.    No Mortgage or Pledge. No Member shall, without the consent of the other Member, which consent shall not be unreasonably withheld, create or permit to arise any mortgage, charge, pledge, lien, or other encumbrance on any of its Units.

12.7.    Change of Control. Unless otherwise approved by two-thirds (2/3) of the Remaining Members, such approval not to be unreasonably withheld, any Change of Legal Control, as hereafter defined, shall be deemed a transfer subject to Section 12.4., whereby the Member whose legal control is changed shall be deemed an Offering Member, the other Members shall be deemed the Remaining Member, and the Offer Notice shall be a written notice from any Member to the other Member notifying them that a Change of Legal Control has occurred. A Change of Legal Control shall have occurred when any of the voting securities (and rights to acquire voting securities) of the Members are no longer held, directly or indirectly, by the entity ultimately controlling such Member on the date it becomes a party to this Agreement. This provision shall apply as well to any Affiliate of a Member to which Units are transferred under Section 12.1. even if such Affiliate does not become a party to this Agreement, provided, however, a change of control for an Affiliate shall occur if it ceases to fit the definition of an Affiliate in Section 1.

AIR_IT, LLC CONFIDENTIAL

12.8.    Full Buy Out Terms

12.8.1. In a Full Buy Out pursuant to Subsection 17.3.2. of this Agreement, the Shareholder(s) having the option to a Full Buy Out shall purchase all, but not less than all, of the Shares of the Shareholder whose Shares to buy out.

12.8.2. The Full Buy Out purchase price shall be equal to the net book value of the Shares determined in accordance with Section 12.9. unless otherwise agreed by an Absolute Majority of the Shareholders.

12.8.3. If the Shareholder(s) having the Full Buy Out option do not make their purchase in cash within 30 days after the price is agreed to pursuant to Subsection 12.8.2. the Full Buy Out option shall be deemed to have expired.

12.8.4. Unless otherwise agreed by the Remaining Shareholders entitled to purchase in a Full Buy Out, the Shareholder(s) shall be entitled to purchase all of the subject Shares.

12.9.    Net Book Value. For all purposes of this Agreement, the net book value of Units shall be determined by the independent auditors for the Company based upon the most recent month of the Company, as reviewed by the auditors. Net book value per Unit shall be determined as: month end total assets minus total liabilities divided by the number of Units outstanding on the date of the determination. In the event net book value is negative, it shall be deemed for purposes of this Agreement to be US$1.

12.10.    Restriction on Transfers Generally

12.10.2. Any transfer of Units permitted by this Agreement shall be subject to whatever government or regulatory approvals may be necessary to ensure the continued operation of the Company.

12.10.3. If a Member (the "Purchasing Member") attempts to exercise a purchase option under this Section 12 or any other provision of this Agreement, such Purchasing Member shall apply for whatever government or regulatory approvals may be necessary to authorize the Purchasing Member to exercise such purchase option and to assure that the Company shall retain the ability to continue operations, as expeditiously as may be practicable after giving notice of its intention to exercise the purchase option. The option exercise period shall be extended for a reasonable period of time to accommodate the approval process. In the event that the transfer of Units to such Purchasing Member is not so approved or is otherwise prohibited by law or regulation, the Purchasing Member shall be deemed not to have exercised its purchase option and the purchase option of the other Members and the rights of the Member wishing to transfer its Units, shall remain as if the Purchasing Member had not attempted to exercise its purchase option under this Section 12 or any other provision of this Agreement.

AIR_IT, LLC CONFIDENTIAL

12.11. Unauthorized Transfers Void. Any transfer of Units which is not in full compliance with the provisions of this Agreement shall be null and void.

12.12. Transferees to Become Parties to Agreement with Members. No transfer of any units of the Company to a person other than an Affiliate shall be registered until the transferee has entered into an agreement with the Remaining Member, the terms of which agreement shall regulate the affairs of the Company and the relationship of the Members and shall be in all respects satisfactory to the Remaining Member, provided, however, that the Remaining Members shall not be unreasonable in their requirements. Should the transferee agree to be bound by the terms of this Member's Agreement, including the assumption of any outstanding loans, guarantees or similar obligations of the transferring Members, the Remaining Members shall be deemed to have approved the terms.

## 13.    CLOSING

13.1. The Closing of this Agreement shall be held at such place and time as the Members shall agree.

13.2.    The Members' obligation to Close shall be contingent upon the Members' procuring to take place all such matters as are required by this Agreement to take place at Closing, including without limitation, the following:
   (a)  At the Closing, each of the Members shall subscribe to and pay for Units in cash and/or in equipment, as agreed among the Parties. Certification of the validity of the transfer to the Company of any tangible assets or equipment must be provided at Closing; and
   (b)  The Company's first Five Year Financial Plan (attached hereto as Appendix A) to which the Members shall unanimously agree. Subsequent to Closing, the Company will also develop and maintain a Business Plan, which the Company shall update quarterly, and which the board shall approve annually.

## 14. CONFIDENTIALITY

14.1.    Confidential Information. Each Member shall exercise all of its powers to assure that its Affiliates, Directors, officers and employees and the Company shall keep secret all trade secrets, know-how and other confidential information of the Company and of the other Members and shall not use any of such confidential information except as authorized in writing by the owner. This obligation shall survive termination of this Agreement but shall cease to apply to any information (i) after it has come into the public domain, (ii) if it was or becomes known to the recipient without breach of any obligation of confidentiality or (iii) if it is independently developed by the recipient. Subject to the obligation against disclosure of confidential information of a Member, the Company shall freely share with the Members information obtained or developed by the Company in the course of Company's operation.

14.2. This Agreement. Each Member shall, and shall exercise all of its powers so as to assure that its Affiliates, Directors, officers and employees and the Company shall, keep secret the existence

AIR_IT, LLC CONFIDENTIAL

of and the terms and conditions of this Agreement, unless disclosure is required by statutory, regulatory or other governmental requirement.

## 15. NON COMPETITION

15.1.    During Term of This Agreement. Unless otherwise agreed among the Members, until the termination of this Agreement the Members shall not, and shall require that their Affiliates, Directors, officers and key employees and the Directors, officers and employees of their Affiliates shall not engage in any business that provides, or participates in providing, products or services substantially similar to those provided by the Company, except through the Company, in the Territory.

15.2.    After Termination of Agreement. If any Member or any of its Affiliates ceases to be a member in the Company for any reason other than the liquidation of the Company, that Member shall not, and shall require that its Affiliates, Directors, officers or key employees shall not, for a period of two years from the date of such cessation directly or indirectly carry on or own an interest in a business (other than a passive investment) which provides, or participates in providing, products or services substantially similar to those provided by the Company, in the Territory. This Section shall survive termination of this Agreement.

## 16.    INTELLECTUAL PROPERTY

16.1.    Members' Trademarks. Unless otherwise provided in this or related agreements, no trademark, trade name or other trade identity owned or employed by any Member shall be used in connection with the activities or business of the Company without the express consent of all the Members. The Company shall execute any documents necessary to ensure that any agreed use of such trade identity is properly attributed to that Member. In the event a Member ceases to be a member of the Company, the remaining Member shall take such steps as may be necessary to cause the Company to remove any reference to the withdrawing Member's name from any business description of the Company.

16.2.    Company's. Any trademark, trade name or other trade identify developed by the Company shall be owned by the Company. Upon dissolution or other material changes in ownership of the Company, all Members shall agree on disposition of the rights to such trade identity. Absent agreement, all use of such trade identity by the Company or any Member shall cease and shall not be used thereafter.

16.3 Patents and Copyrights
All patents and copyrights developed in connnection with the course of Company's business shall be assigned to Company, regardless of whether originally developed by the Company itself or any of its Members.

AIR_IT, LLC CONFIDENTIAL

## 17.    TERMINATION

17.1.    <u>Indefinite Term</u>. This Members Agreement shall continue for as long as the Company maintains its corporate existence.

17.2.    <u>Upon Transfer of Units or Dissolution</u>. This Agreement shall terminate (except Section 14, 15 and 16 of this Agreement, as well as any other Section that specifically provides that such Section shall survive termination) with respect to any Member upon such Member and its Affiliates ceasing to be a Member of the Company by reason of a transfer of units pursuant to Section 12.2., and shall terminate with respect to all the Members upon the Company ceasing operations or being dissolved.

17.3.    <u>Events of Defaults</u>

17.3.1. Each of the following events shall constitute an Event of Default hereunder with respect to a Member ("Defaulting Member")

    (a)   The voluntary filing of a petition or action in bankruptcy or insolvency or the like by the Member, or the entry of a final judgment or order sustaining a petition or action taken by the Member's creditors; or the making of an arrangement by the Member with its creditors; the liquidation, dissolution or winding up of the Member; or ceasing by the Member to conduct business.

    (b)   The attempt by a Member to sell, encumber or otherwise dispose of any of its units of the Company otherwise than in accordance with the terms of this Agreement (i.e., otherwise than in accordance with Section 12); or

    (c)   The breach by a Member of any material obligation under this Agreement which is not remedied within 60 days after written notice of such breach; or

17.3.2. Subject at all times to the requirements of applicable laws and regulations, upon the occurrence of an Event of Default with respect to a Defaulting Member, the non-defaulting Members shall have the option, exercisable by notice to the Defaulting Unit holding, to purchase all of the Units of the Defaulting Member in a Full Buy Out, except that the price shall be equal to the net book value of the Units as determined in accordance with Section 12.9. Upon such purchase, the Defaulting Member's interest in the Company shall terminate; however, such termination shall be without prejudice to the rights of the other Member pursuant to any or all remedies available for damages caused by the Defaulting Member by reason of an Event of Default as defined in Subsection 17.3.1.

17.4.    <u>Board As Transfer Agent</u>. The Board is hereby appointed as the agent of the Member in breach for the administration of the sale and purchase of the units within thirty (30) days and any Director is hereby authorized by such Member to sign any document and take any action required to effect such sale and purchase.

AIR_IT, LLC CONFIDENTIAL

17.5. Rights. Any such termination under this Section shall be without prejudice to the accrued rights of the parties under this Agreement against each other.

## 18.    REPRESENTATIONS AND WARRANTIES

18.1.    Each Member represents and warrants to the others that:

(a)    It is a company or commercial entity duly incorporated in its country of incorporation and has the corporate power and authority to enter into and perform this Agreement.

(b)    The execution, delivery and performance of this Agreement has been dully authorized by all necessary corporate action, and the persons signing this Agreement are duly authorized to do so on its behalf.

(c)    No governmental authorization, license, consent or the like is required for the execution and performance of this Agreement, except such as have been obtained.

(d)    This Agreement and the performance hereof by the Members does not conflict with any provision of its charter, bylaws or any material contract or agreement to which it is a party or by which it or its properties are bound.

18.2.    The representations, warranties and undertakings set out in this Section 18 shall be deemed to be repeated as at Closing as if all references herein to the date of this Agreement were references to the date of Closing.

18.3.    If, prior to Closing, any of the representations, warranties or undertaking set out in this Section 18 are found to be untrue, misleading or incorrect or have not been fully carried out in any respect, any Party hereto shall not be bound to proceed with Closing and such Party may by notice rescind this Agreement without liability on its part. The right conferred upon the Parties by this Subsection 18.3. is in addition to and without prejudice to any rights and remedies of such Parties.

18.4.    Each Party hereto hereby further undertakes to indemnify and keep indemnified the other Parties against any loss or liability suffered by any of them as a result of its breach of any of these representations, warranties and undertakings.

18.5.    Each Party and any persons authorized by it will be given all relevant and reasonably available information relating to the Existing Members as such Party may reasonable request.

## 19.    MISCELLANEOUS

19.1.    Assignment. This Agreement shall be binding upon and shall insure to the benefit of the Parties, their successors and permitted assigns, provided that the benefit of this Agreement may not

AIR_IT, LLC CONFIDENTIAL

be assigned or transferred in whole or in part by any Member without the prior written consent of the other Member except as provided in Section 12.

19.2.    Implementation of Agreement. Each Member agrees that it will at all times:

(a)    Use all means reasonably available to it (including its voting power direct or indirect in relation to the Company) so as to ensure that the Company and any Director of the Company nominated by it (and any alternate of such Director) shall implement the provisions of this Agreement relating to the Company and shall cause the Company to comply with all applicable laws;

(b)    Cooperate in good faith and execute such documents and take such action as may be reasonably required to give full effect to the provisions and intent of this Agreement; and

(c)    Use its best endeavors to develop and expand the business of the Company.

19.3.    No Agency or Partnership. Nothing in or relating to this Agreement shall or shall be deemed to constitute a partnership or agency relationship between any of the parties.

19.4.    Arbitration. Arbitration shall be conducted as follows:

Any dispute arising out of or in connection with this Agreement shall be submitted for arbitration in Illinois, to be conducted in accordance with the substantive and procedural rules of the International Chamber of Commerce (the "ICC"), and:

(a)    All proceedings shall be conducted in English and a daily transcript in English shall be prepared;

(b)    There shall be three arbitrators, one to be selected by each side to the dispute, and the third to be selected by the other two arbitrators, who shall concurrently serve as Chairman of the arbitration panel;

(c)    In the event that there are multiple Parties on one side of the dispute, they shall agree, within 15 days from the demand for arbitration, on a single arbitrator to be appointed for their side of the dispute, and if the Parties fail to agree on the appointment of the arbitrator for their side, the ICC shall appoint the arbitrator for their side;

(d)    The arbitrators shall be fluent in the English language; and

(e)    The English language text of this Agreement shall be used in the arbitration proceedings.

(f)    The arbitration award shall be final and binding on the Members. The costs of arbitration shall be determined by the arbitration panel. Any award of the arbitrators shall be enforceable by any court having jurisdiction over the Member or Members against which the award has been rendered, or wherever assets of the Member or Members against which the award has been rendered can be located.

19.5.    Undue Influence. The Company will depend on product and service quality and superiority, combined with outstanding customer support to sell its products and services. The Members believe that the Company can continue to grow and prosper without succumbing to improper and unethical demands. The Company will not do business with any distributor, agent, customer or other person where the Company knows or suspects that payoffs or similar practices

AIR_IT, LLC CONFIDENTIAL

are involved in doing such business. The Parties agree that all actions taken by any of them in the conduct of the business of the Company shall at all times be in compliance with all applicable laws of all relevant jurisdictions applicable to the conduct of the Company's business, including but not limited to all laws which prohibit:

(a) anyone from paying or providing, or offering to pay or provide, any sum or thing of value to any governmental official or political party, or to any third party for payment to a governmental official or political party for the purpose of influencing the decision-making of a governmental official in order to provide a commercial advantage to the Company; and

(b) all applicable export control laws and regulations, or such similar laws of any jurisdiction from or to which equipment or materials may be exported to or from Romania and the United States.

19.6.    Severability. If any term or provision of this Agreement shall be found to be invalid or unenforceable for any reason, the other terms or provisions shall not be affected and such invalid or unenforceable term shall be deemed to be deleted.

19.7. Inconsistency. In the event of any conflict between the Bylaws and any provisions of this Agreement, the provisions of this Agreement shall, as among the Members, prevail.

19.8. Language. The Company shall retain all documents required by applicable laws and regulations, and in the format so specified by such laws or regulations. In addition, the English language version of the Member Agreement and the bylaws, books of the minutes of the Council and of meetings of the Members and all accounting books and accounts shall control as between the Members for purposes of interpretation and enforcement. Business plans, reports and other business documents of the Company shall also be kept in English.

19.9.    Counterparts. This Agreement may be executed in multiple counterparts, each of which when fully executed shall be deemed an original for all purposes.

19.10. Governing Law. This Agreement shall be governed by and construed in accordance with laws of the state of Illinois in the United States of America.

19.11. Amendment, Waiver. Any waiver, amendment or other modification of this Agreement or its Appendices will not be effective unless in writing and signed by the Party against whom enforcement is sought. The failure by any Party to exercise any of its rights hereunder in any instance will not be deemed a waiver of such rights in the future or a waiver of any other rights under this Agreement.

19.12. Notice. Notice shall be sent to the respective Parties at the address set forth in the then-current Register of Members.

19.14. Entire Agreement. The foregoing, together with Appendices attached hereto, contain the entire and only agreement among the Members, and herein have merged all prior and collateral

AIR_IT, LLC CONFIDENTIAL

representations, agreements, promises, and condition, whether oral or written, and any representations, agreements, promises and conditions not incorporated herein shall not be binding on any of the Members.

IN WITNESS WHEREOF, the Parties, by their duly authorized officers, have executed this Members Agreement as of the dates below.

AMERICAN INTERNATIONAL RADIO, INC.

By: ......................................................

         *DOREL*     *NASUI*

Title: ...... *President / CEO* ..........................

Date: ...... *01/09/2004* ..........................

IT SYSTEMS INTERNATIONAL, LLC.

By: ......................................................

         *JUSTIN TAMASE*

Title: ...... *PRESIDENT / CEO* ..................

Date: ...... *01/09/2004* ..........................

AIR_IT, LLC CONFIDENTIAL

## APPENDIX A
### Initial Financial Plan

The Company intends to be active in the sales and marketing of turnkey integrated Systems, in Software development, marketing and outsourcing services for data and software production.

The preferred software model for operating systems is envisioned to be similar to that of an Application Service Provider ("ASP").
It is estimated that a $200,000.00 loan will provide seed funding for AIR_IT.

After the Company (1) receives notice of trademark registration, (2) labels its proprietary software with appropriate copyright notices, and (3) obtains approval from the Board for its financial plan, the Company will begin to seek additional funding, in the form of grants, loans, and equity. It is envisioned that the additional funding sought may be up to $10 million.

It is the intent of the Members that their investments in the Company become liquid via listing on a U.S.A. stock exchange.

AIR_IT, LLC CONFIDENTIAL

## APPENDIX B
### Register of Members

| Member | No. units owned | Ownership Percentage |
|---|---|---|
| AMERICAN INTERNATIONAL RADIO (AIR) | 500,000 | 50% |
| IT SYSTEMS INTERNATIONAL (ITS) | 500.000 | 50% |

AIR_IT, LLC CONFIDENTIAL

APPENDIX C
Contribution of Members

In exchange for the ownership interests described in the Register of Members and provided as Appendix B, the Members warrant that they will provide to the Company the following assets. The members hereby agree to execute such documents as may be necessary to convey the following to the Company.

C.1    AMERICAN INTERNATIONAL RADIO INC. ("AIR") will contribute the following to the Company:
- marketing and sales leads through its own sales force and contacts in the software market;
- logistical support at its headquarters in Chicago;
- a loan or a loan guarantee to the company at a preferential interest rate in the amount of US$ 200,000.00 in order to support the infrastructure build-up and required working capital.

C.2    IT SYSTEMS INTERNATIONAL, LLC (ITS) will contribute the following to the Company:
- available a B2B platform for corporate cards system in the form of know-how, software, installation of the System at the chosen site, which will start to be marketed as A.I.R. Card System.
- technical support;
- technical information and all intellectual property rights required for the Company to fulfill its purpose as defined in section 4.1 of the Member Agreement ("the Technology"); ITS warrants and represents that it has the ability to convey these rights to the Technology to the Company, and indemnifies the Company against infringement of the Technology on any third party's intellectual property rights. Any additional development that ITS performs for the Company shall be deemed works for hire, and all intellectual property rights will inure to the benefit of AIR_IT, LLC. It is specifically understood that in order for the Company to maximize its attractiveness to clients, U.S. government funding sources, and/or private investors, all existing and future intellectual property rights in connection with the Company's business must reside unambiguously with the Company.

C.3    It is a basic strategic intention that the Company will outsource the required software development to IT Systems Romania.